# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER LOPEZ, | : | |
| | : | NO. 5:26-CV-00652-CH |
| Plaintiff, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| SCHOOL DISTRICT OF | : | |
| LANCASTER, JENNIFER EATON, in | : | |
| her individual capacity and in her | : | |
| official capacity as a member of the | : | |
| School District of Lancaster Board of | : | |
| Directors, ROBIN GOODSON, in her | : | |
| individual capacity and in her official | : | |
| capacity as a member of the School | : | |
| District of Lancaster Board of | : | |
| Directors, MOLLY HENDERSON, in | : | |
| her individual capacity and in her | : | |
| official capacity as a member of the | : | |
| School District of Lancaster Board of | : | |
| Directors, KATRINA HOLMES, in her | : | |
| individual capacity and in her official | : | |
| capacity as a member of the School | : | |
| District of Lancaster Board of | : | |
| Directors, MARA CRESWELL | : | |
| MCGRANN, in her individual capacity | : | |
| and in her official capacity as a member | : | |
| of the School District of Lancaster | : | |
| Board of Directors, KEITH MILES, | : | |
| JR., in his individual capacity and in his | : | |
| official capacity as the Superintendent | : | |
| of the School District of Lancaster | : | |
| LUIS MORALES, in his individual | : | |

capacity and in his official capacity as a    :
member of the School District of    :
Lancaster Board of Directors, DAVID    :
PARRY, in his individual capacity and    :
in his official capacity as a member of    :
the School District of Lancaster Board    :
of Directors, ANITA PILKERTON-    :
PLUMB, in her individual capacity and    :
in her official capacity as a member of    :
the School District of Lancaster Board    :
of Directors, and KAREENA RIOS, in    :
her individual capacity and in her    :
official capacity as a member of the    :
School District of Lancaster Board of    :
Directors.    :
    :
        Defendants.    :

---

## AMENDED COMPLAINT

---

AND NOW, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff Christopher Lopez ("Mr. Lopez"), by and through his attorneys, Babst, Calland, Clements, and Zomnir, P.C., asserts the following causes of action against Defendants School District of Lancaster, Jennifer Eaton, Robin Goodson, Molly Henderson, Ed.D., Katrina Holmes, Mara Creswell McGrann, Keith Miles, Jr., Ed.D., Luis Morales, David Parry, Ph.D., Anita Pilkerton-Plumb, and Kareena Rios, and in support thereof, avers the following based upon Mr. Lopez's most recent knowledge, information, and reasonable belief:

2

## INTRODUCTION

1. This case provides an unfortunate illustration of school district politics at the expense of a long-tenured and well-respected employee's constitutional, statutory, and contractual rights.

2. Mr. Lopez has spent the last 27 years working for or on behalf of Defendant School District of Lancaster (the "School District" or "District").

3. Mr. Lopez began his employment with the District as a paraprofessional and worked his way up the proverbial ladder until he achieved his current position as an Assistant Superintendent.

4. Since achieving the rank of Assistant Superintendent, Mr. Lopez has made meaningful contributions to the District and received consistently positive performance evaluations to that effect.

5. Indeed, Mr. Lopez was the only member of the District's senior leadership team to receive a "distinguished" performance rating last year.

6. Despite his unblemished performance record, Mr. Lopez has recently been the target of an unjustified and unprovoked campaign by the District's Superintendent, Defendant Keith Miles, Jr., Ed.D ("Dr. Miles"), to remove Mr. Lopez from the District for personal reasons.

7. Specifically, after Mr. Lopez challenged a suggestion by Dr. Miles to further reduce District staffing at a one-on-one meeting between the two on

November 12, 2025, Dr. Miles placed Mr. Lopez on indefinite administrative leave during a follow-up meeting on November 14, 2025.

8.    Mr. Lopez did not receive any written charges from the District before he was placed on indefinite leave.

9.    Nor did Mr. Lopez receive an opportunity to be heard before the School District of Lancaster Board of Directors (the "School Board" or "Board") before he was placed on indefinite leave.

10.    Dr. Miles met with Mr. Lopez again on December 1, 2025.

11.    Mr. Lopez requested that he be reinstated both before and during the December 1, 2025 meeting, but Dr. Miles continued Mr. Lopez's indefinite administrative leave and reassigned all of his duties to other members of the District's senior leadership team.

12.    Upon information and belief, Dr. Miles took those actions at the direction and with the approval of the School Board.

13.    Mr. Lopez did not receive any written charges from the District before the continued indefinite leave.

14.    Nor did Mr. Lopez receive an opportunity to be heard before the School Board prior to the continued indefinite leave.

15.    Even now, 160 days after he was initially placed on leave and 143 days since Dr. Miles and the District doubled down on the indefinite leave, Mr. Lopez *still*

4

has not received anything in writing from Dr. Miles or the District identifying the purported basis for his said leave.

16.    In fact, no one from the District—not Dr. Miles, not the President of the School Board Jennifer Eaton, not any of the other School Board members, not the District's Chief of Human Resources Gregory Monskie, not even the District's Solicitor Jeffrey D. Litts, Esquire of Saxton & Stump—has told Mr. Lopez when, if ever, his administrative leave will end.

17.    By subjecting Mr. Lopez to the emotional, reputational, and other harm associated with being placed on indefinite administrate leave, the District, the School Board, and Dr. Miles are attempting to force Mr. Lopez to resign from his position as Assistant Superintendent, albeit for different reasons.

18.    In the case of the District and School Board, their motivation is to achieve cost-savings amid a reported $27.8 million deficit next year.

19.    In the case of Dr. Miles, his motivation is personal because Dr. Miles is trying to get rid of a perceived rival amid concerns that Mr. Lopez wants to unseat Dr. Miles as Superintendent.

20.    Indeed, Dr. Miles articulated that very concern just a few months ago, confronting Mr. Lopez and alleging that Mr. Lopez sought to unseat Dr. Miles and assume his position as Superintendent.

21.    Dr. Miles added that, if Mr. Lopez wanted to be a Superintendent, he should look to another school district.

22.    In furtherance of that personal animus, Dr. Miles made false statements to Solicitor Litts about Mr. Lopez—and upon information and belief, to the School Board as well—including that Mr. Lopez had expressed a desire to resign from his position as Assistant Superintendent and that Mr. Lopez "yelled" at Dr. Miles, in order to fabricate reasons for placing Mr. Lopez on administrative leave.

23.    Motivations aside, the actions of the District, the School Board, and Dr. Miles are unlawful.

24.    With regard to Dr. Miles's unilateral decision to place Mr. Lopez on leave, nowhere in Mr. Lopez's employment agreement is Dr. Miles empowered to place Mr. Lopez on administrative leave.

25.    Mr. Lopez's placement on indefinite leave also flies in the face of the Public School Code of 1949, as amended, 24 P.S. §§ 1-101 to 27-2702 (the "Public School Code").

26.    Although the Public School Code lacks a provision allowing an assistant superintendent to be placed on administrative leave, the Pennsylvania Supreme Court has held that there exists an implied right in the Code to suspend employees on an interim basis. *Burger v. Bd. of Sch. Dirs. of McGuffey Sch. Dist.*, 839 A.2d 1055, 1062 (Pa. 2003).

27.     However, the Supreme Court made clear that only "a school board may implement interim suspensions with or without pay in the face of allegations of serious misconduct," adding: "a school board must insure that procedural due process rights are observed when implementing such measures." *Id.*

28.     In other words, no statutory mechanism exists under the Public School Code for a superintendent to suspend an assistant superintendent without school board approval.

29.     Moreover, the School Board has an affirmative duty to protect the due process rights District employees against any such action taken by Dr. Miles.

30.     And pursuant to the Sunshine Act, 65 Pa.C.S. §§ 701–716, school board approval can only be obtained via a vote of the majority members of the board at a duly-noticed public meeting where a quorum is present. *Id.* § 704.

31.     Here, Dr. Miles initially placed Mr. Lopez on indefinite administrative leave without Board approval, in contravention of the Public School Code.

32.     Dr. Miles therefore violated Mr. Lopez's due process rights. *See Baker v. Moon Area School District*, No. 15-1674, 2018 WL 4057179, at *3–4 (W.D. Pa. Aug. 27, 2018); *see also Antonini v. W. Beaver Area School Dist.*, 874 A.2d 679, 686–87 (Pa. Commw. Ct. 2005).

33.     With respect to Mr. Lopez's continued administrative leave, Mr. Lopez believes and therefore avers that, between November 14, 2025, and November 30,

2025, all of the then-members of the School Board met behind closed doors to deliberate on Mr. Lopez's leave; they decided to continue Mr. Lopez's indefinite leave at that time; and they instructed Dr. Miles to communicate the same to Mr. Lopez, either directly or through Solicitor Litts.

34. The statement that School Board President Ms. Eaton made to the press on or around December 10, 2025—wherein she said that the School Board has been kept "regularly apprised of this matter from the beginning" (Ashley Stalnecker, "Assistant superintendent sues SDL and board, claims superintendent wrongfully placed him on leave," LNP (Dec. 10, 2025), attached hereto as "**Exhibit A**")—confirms this chain of events.

35. The School Board thus violated Mr. Lopez's due process rights by failing to provide Mr. Lopez with notice and an opportunity to be heard before his continued administrative leave. *See Baker v. Moon Area School District*, No. 15-1674, 2018 WL 4057179, at *3–4 (W.D. Pa. Aug. 27, 2018); *see also Antonini v. W. Beaver Area School Dist.*, 874 A.2d 679, 686–87 (Pa. Commw. Ct. 2005).

36. The School Board also violated the Public School Code because a school board can only suspend an assistant superintendent amid allegations of "serious misconduct," *Burger*, 839 A.2d at 1062, which are lacking here.

37. And in directing Dr. Miles to place Mr. Lopez on indefinite administrative leave behind closed doors, the School Board violated the Sunshine

8

Act by taking official action outside of a duly noticed public meeting. 65 Pa.C.S. § 704.

38.    Regrettably, the District, the School Board, and Dr. Miles have doubled down on their wrongdoing by making multiple threats to Mr. Lopez about potential disciplinary action, primarily through Solicitor Litts, to pressure Mr. Lopez into voluntarily ending his employment with the District.

39.    Those efforts culminated on April 3, 2026, when Mr. Monskie sent a "Notice of Allegations" to Mr. Lopez at the direction of the District, the School Board, and Dr. Miles, upon information and belief.

40.    In the so-called "Notice," the District threatens to terminate Mr. Lopez based on a series of vague, anonymous allegations resulting from a sham investigation that the District initiated months *after* Mr. Lopez was placed on indefinite administrative leave—and *after* he initiated litigation against the District and others for violating his constitutional, statutory, and contractual rights—making the District's actions a classic case of retaliation.

41.    But no amount of intimidation by Solicitor Litts, Mr. Monskie, or anyone else affiliated with the District will cause Mr. Lopez to condone the ongoing violations of his constitutional, statutory, and contractual rights by Defendants.

42.    In the end, Mr. Lopez is not just standing up for himself but for the approximately 10,000 students and 1,600 employees within the District who deserve

to learn and work in an environment free from intimidation—and where basic due process is afforded to all.

43. Accordingly, Mr. Lopez raises claims of violation of 42 U.S.C. § 1983 against Dr. Miles; violation of 42 U.S.C. § 1983 against Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios; breach of contract against the District; tortious interference with contractual relations against Dr. Miles; and violation of the Sunshine Act against Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios.

44. Mr. Lopez seeks compensatory damages, noneconomic damages, punitive damages, and attorney's fees and costs, among other relief.

## PARTIES

45. Plaintiff Christopher Lopez is an adult individual who resides at 279 Kingsbridge Drive, Lititz, Pennsylvania 17543.

46. Defendant School District of Lancaster is a Pennsylvania School District with a principal place of business at 251 South Prince Street, Lancaster, Pennsylvania 17603.

47. Defendant Jennifer Eaton is an adult individual who resides within the District and serves as the President of the School Board; she was first elected to the Board in 2021.

48.    Defendant Robin Goodson is an adult individual who resides within the District and serves as a member of the School Board; she was first elected to the Board in 2019.

49.    Defendant Molly Henderson, Ed.D. ("Dr. Henderson"), is an adult individual who resides within the District and serves as a member of the School Board; she was first elected to the Board in 2021.

50.    Defendant Katrina Holmes is an adult individual who resides within the District and serves as a member of the School Board; she was first elected to the Board in 2023.

51.    Defendant Mara Creswell McGrann is an adult individual who resides within the District and serves as a member of the School Board; she was first elected to the Board in 2017.

52.    Defendant Keith Miles, Jr. is an adult individual who serves as the District's Superintendent.

53.    Defendant Luis Morales is an adult individual who resides within the District and serves as a member of the School Board; he was first elected to the Board in 2021.

54.    Defendant David Parry, Ph.D. ("Dr. Parry"), is an adult individual who resides within the District and serves as a member of the School Board; he was first elected to the Board in 2017.

11

55.     Defendant Anita Pilkerton-Plumb is an adult individual who resides within the District and serves as a member of the School Board; she was first elected to the Board in 2024.

56.     Defendant Kareena Rios is an adult individual who resides within the District and serves as a member of the School Board; she was first elected to the Board in 2019.

57.     At all relevant times hereto, the District acted and/or failed to act by and through the members of the School Board.

## JURISDICTION AND VENUE

58.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because certain of Mr. Lopez's claims arise under the U.S. Constitution and the laws of the United States.

59.     This Court has supplemental jurisdiction over Mr. Lopez's state law claims pursuant to 28 U.S.C. § 1367.

60.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391, because the events giving rise to Mr. Lopez's claims occurred within this judicial district and Defendants are considered to reside within this judicial district.

## SUMMARY OF ACTION

### Mr. Lopez's Tenure and Promotion to Assistant Superintendent

61.    Mr. Lopez has worked for or on behalf the District for the past 27 years in various capacities.

62.    The District promoted Mr. Lopez to an Assistant Superintendent in 2024.

63.    The District and Mr. Lopez contemporaneously entered into an Employment Agreement for Assistant Superintendent (the "Employment Agreement"), a true and correct copy of which is attached hereto as "**Exhibit B**."

64.    Pursuant to the Employment Agreement, the School District agreed to employ Mr. Lopez as an Assistant Superintendent for a four-year term "under the terms and conditions of this Agreement." (Employment Agreement §§ 1, 2.)

65.    The Employment Agreement states that Mr. Lopez "shall devote [his] full working time and best efforts to the performance of the Assistant Superintendent's duties as Assistant Superintendent for the School District." (Employment Agreement § 4(b).)

66.    The Employment Agreement also provides that Mr. Lopez "shall perform such duties as assigned to him by the Board and/or the Superintendent as

set forth in Section 1082 of the Public School Code."  (Employment Agreement § 4(a).)[1]

67.    The Employment Agreement further contains a provision delineating five instances in which it may be terminated—specifically, by "mutual agreement" of the parties, "Resignation/Retirement," "Disability," "Termination for Cause," and "Death."  (Employment Agreement § 7.)

68.    In the case of termination for cause, the Employment Agreement incorporates by reference "the reasons specified in Section 1080 of the Public School Code," adding:

> The Board shall not arbitrarily or capriciously call for the Assistant Superintendent's dismissal, and the Assistant Superintendent shall, in any event, *have the right to written charges, notice of hearing, fair and impartial hearing, all elements of due process*, and the right to appeal to a court of competent jurisdiction.

(Employment Agreement § 7(d) (emphasis added).)

69.    The referenced section of the Public School Code states,

> District superintendents and assistant district superintendents may be removed from office and have their contracts terminated, after hearing, *by a majority vote of the board of school directors* of the district, for neglect of duty, incompetency, intemperance, or immorality, of which hearing notice of at least one week has been sent by mail to the accused, as well as to each member of the board of school directors.

24 P.S. § 10-1080 (emphasis added).

---

[1] *See* 24 P.S. § 10-1082 ("Assistant superintendents shall perform such duties as may be assigned them by the boards of school directors or by the district superintendents.").

70.    The Employment Agreement additionally contains an integration clause that provides, "This Agreement sets forth the entire understanding of School District and the Assistant Superintendent with respect to the subject matter of this Agreement." (Employment Agreement § 7.)

71.    The Employment Agreement contains no provision authorizing Dr. Miles or even the School Board itself to place Mr. Lopez on administrative leave.

### Dr. Miles's Initial Placement of Mr. Lopez on Indefinite Administrative Leave

72.    Mr. Lopez has an unblemished professional record.

73.    From the inception of his employment with the District, Mr. Lopez has never been the subject of disciplinary action.

74.    Mr. Lopez also has a long history of positive performance reviews.

75.    Mr. Lopez, for instance, was the only member of the District's senior leadership team to receive a "Distinguished" performance rating last year. (*See* 2024–2025 Final Evaluation for Mr. Christoper Lopez, attached hereto as "**Exhibit C**.")

76.    Mr. Lopez's most recent evaluation also stated that he had an "*exceptional* year," "*exceeded* all evaluation targets," "*exceed[ed]* all of the strategic plan goals under this oversight," and that "[h]is transition into the role of Assistant Superintendent was *successful*." (Ex. C at 4 (emphasis added).)

15

77. Since beginning in his role as Assistant Superintendent, Mr. Lopez and Dr. Miles have engaged in weekly one-on-one meetings to discuss the ongoing status of the District and how Mr. Lopez could support Dr. Miles and the District in their various endeavors.

78. On occasion, Dr. Miles and Mr. Lopez would disagree on Dr. Miles's approach to different scenarios.

79. Those disagreements were always respectful on the part of both parties, and Dr. Miles would regularly tell Mr. Lopez that he appreciated his honest feedback.

80. Against that backdrop, on November 12, 2025, Mr. Lopez participated in a regularly scheduled one-on-one meeting with Dr. Miles.

81. Dr. Miles explained that a number of personnel cuts were going to be made to Mr. Lopez's team.

82. Mr. Lopez expressed frustration at those anticipated cuts and explained that they would make it difficult for him to adequately perform his duties and meet the organizational needs of the District.

83. The November 12th meeting ended without incident otherwise.

84. Two days later, on November 14, 2025, Dr. Miles called Mr. Lopez to his office for a meeting among the pair and the District's Chief of Human Resources, Gregory Monskie.

16

85.     Dr. Miles said that an assistant superintendent is the most important position "in the organization."

86.     Dr. Miles told Mr. Lopez that prior to Mr. Lopez being promoted, unnamed individuals had expressed concern about Mr. Lopez being in the Assistant Superintendent role.

87.     Dr. Miles said that he "doesn't think it's working out."

88.     Mr. Lopez responded by saying he felt blindsided by Dr. Miles's remarks as he was not provided an agenda in advance of the meeting.

89.     Mr. Lopez also said he does not feel supported by Dr. Miles.

90.     Dr. Miles replied that Mr. Lopez "doesn't seem like he's willing to make concessions as we go into this period of reduction."

91.     Dr. Miles said, ultimately, he does not have an assistant superintendent that is "aligned to the organization."

92.     Dr. Miles stated that "an amicable split with the organization" "works best for everyone."

93.     At the end of the November 14th meeting, Dr. Miles said that Mr. Lopez should consider potential acceptable terms of separation from his employment with the District.

94.     Dr. Miles then demanded that Mr. Lopez prepare a separation agreement and circulate it to him by 3:00 p.m. on November 20, 2025.

17

95.    At no point during the November 14th meeting did Mr. Lopez indicate a desire or willingness to separate from his employment with the School District.

96.    Mr. Monskie took contemporaneous notes of the meeting, true and correct copies of which are attached hereto as "**Exhibit D**."

97.    Neither Dr. Miles nor Mr. Monskie provided Mr. Lopez with any written charges before, during, or after the meeting.

### The District's Post-Hoc Effort to Rehabilitate Its Misconduct

98.    Dr. Miles scheduled a follow-up meeting among him, Mr. Lopez, and Mr. Monskie for December 1, 2025.

99.    In the lead-up to that meeting, Mr. Lopez, through the undersigned counsel, sent a letter to Solicitor Litts, a true and correct copy of which is attached hereto as "**Exhibit E**" (minus the appended Employment Agreement).

100.   In the letter, the undersigned counsel wrote, in part:

> Mr. Lopez will not resign from his position as an Assistant Superintendent for the District, and should Dr. Miles terminate Mr. Lopez in response, it will fly in the face of Mr. Lopez's Employment Agreement.  This is because the Agreement clearly, specifically, and unambiguously states that Mr. Lopez can only be terminated for "valid and just cause for the reasons specified in Section 1080 of the Public School Code."  (8/20/24 Employment Agreement ¶ 7(d)[.])  Such cause is lacking here as the apparent genesis of Mr. Lopez's anticipated termination is a closed-door discussion between him and Dr. Miles on November 12, 2025, and nothing that Mr. Lopez uttered during that discussion comes remotely close to constituting "neglect of duty, incompetency, intemperance, or immorality."  24 P.S. § 10-1080(a). Thus, any attempt by Dr. Miles to terminate Mr. Lopez will result in the

School Board "arbitrarily" and "capriciously" terminating Mr. Lopez, in breach of his Employment Agreement.

Accordingly, we demand that Mr. Lopez be removed from administrative leave and returned to his position as Assistant Superintendent for the District, effective at 8:00 a.m. on December 1, 2025.

(Ex. E at 1.)

101.    Solicitor Litts sent a reply email on November 30, 2025, a true and correct of which is attached hereto as "**Exhibit F**."

102.    Solicitor Litts admitted that Dr. Miles placed Mr. Lopez on indefinite administrative leave.

103.    Solicitor Litts used the balance of the email to attempt to retroactively manufacture a basis for that impermissible action.

104.    According to Solicitor Litts, Dr. Miles did so to provide Mr. Lopez "with some time off to confer with appropriate people and come up with proposed terms for an agreement to make his stated desire a reality."  (Ex. F at 1.)

105.    Solicitor Litts suggested that Mr. Lopez stated an intention to resign during the November 12th meeting—specifically, that he "no longer wanted to work for the school district," (Ex. F at 1)—an assertion flatly contradicted by Mr. Monskie's contemporaneous notes of the meeting.

106.    In any event, Mr. Lopez never said that never wanted to work for the District during the November 12th meeting.

19

107.   Upon information and belief, Dr. Miles told Solicitor Litts that Mr. Lopez said he no longer wanted to work for District to try to justify placing Mr. Lopez on administrative leave.

108.   Solicitor Litts went on to state that, "[i]f [Mr. Lopez] does not want to resign, he needs to talk directly with Dr. Miles regarding his changed position." (Ex. F at 1.)

109.   Solicitor Litts next claimed that Mr. Lopez "yelled at" Dr. Miles during the November 12th meeting, (Ex. F at 1), another contention squarely refuted by Mr. Monskie's contemporaneous notes.

110.   Solicitor Litts added: "The school district's superintendent does not need to allow a subordinate to direct unprovoked anger at him or to undermine the good working relationships within the district's central office administrative team." (Ex. F at 1.)

111.   Mr. Lopez never yelled at Dr. Miles during the November 12th meeting.

112.   Upon information and belief, Dr. Miles told Solicitor Litts that Mr. Lopez yelled at him during the November 12th meeting to justify placing Mr. Lopez on administrative leave.

113.   Solicitor Litts concluded his email by threatening disciplinary action against Mr. Lopez while simultaneously feigning ignorance as to what such discipline would entail.

114.   Specifically, Solicitor Litts wrote: "[Mr. Lopez] needs to be prepared for potential disciplinary consequences for his unprofessional behavior.  I do not know what those potential consequences might be, but Chris' procedural due process rights will be respected, if such action proves necessary."  (Ex. F at 1.)

115.   Mr. Lopez, through the undersigned counsel, promptly responded to Solicitor Litts's correspondence via email, a true and correct copy of which is attached hereto as "**Exhibit G**."

116.   The undersigned counsel wrote:

We disagree entirely with the version of events as described in your email, which we presume is that of Dr. Miles given that he and Mr. Lopez were the only individuals present for the conversation in question.  To the contrary, Mr. Lopez at no time "yelled" at Dr. Miles, nor stated that he intended to tender his resignation – or suggest that he otherwise wanted to terminate his employment with the District.

Indeed, it is only now, two weeks after the initial conversation and having already had one meeting with Dr. Miles and Mr. Monskie that the notion of some intention to resign has been brought to light.  To be clear, Mr. Lopez has every intention of continuing in his role as Assistant Superintendent and will report to work tomorrow as regularly scheduled.

Given that position, it is unclear what the purpose of the meeting scheduled for tomorrow morning may be, but it is of concern that Mr. Lopez may be walking into a disciplinary discussion under the guise of a meeting to discuss his alleged intent to resign.  If the purpose of the meeting is truly for Mr. Lopez to convey his intentions, we would respectfully request that this email serve as formal notice of his intentions, obviating the need for the meeting altogether.  If, on the other hand, the stated purpose of the meeting is a ruse, and Dr. Miles intends to impose some sort of discipline nearly three weeks after the discussion took place (and after Dr. Miles claims that Mr. Lopez put

himself on indefinite leave), then we ask that the meeting be held via Zoom or Teams and recorded, so that a complete and accurate record of their conversation can be made. And, should any discipline be given to Mr. Lopez in connection with the November 12th discussion – either tomorrow or at some future time – he will insist the District afford him the due process that has been lacking to date, including but not limited to a full hearing before the Board.

(Ex. G at 1.)

117.   Solicitor Litts replied the next day via email, a true and correct copy of which is attached hereto as "**Exhibit H**."

118.   Solicitor Litts stated that "[i]f Mr. Lopez believes his employment with the school district should continue, he [sic] understand that he has a duty to meet with his immediate supervisor," (Ex. H at 1), continuing to perpetuate the fiction that Mr. Lopez previously indicated an intent to resign.

119.   Again, at no point in time did Mr. Lopez say to Dr. Miles that he intended to resign.

120.   Solicitor Litts then indicated that the planned December 1st meeting would not be recorded.

121.   Solicitor Litts closed his email by again threatening disciplinary action against Mr. Lopez: "As I stated previously, Mr. Lopez will be afforded procedural due process if, or when, any potential disciplinary action is taken." (Ex. H at 1.)

122.   Meanwhile, Dr. Miles meets with the School Board President and School Board Vice President every Friday to discuss District matters.

123. Upon information and belief, Dr. Miles met with Ms. Eaton and the then-Vice President of the School Board on November 14, 2025, and informed them that he unilaterally placed Mr. Lopez on indefinite administrative leave earlier that day.

124. Upon information and belief, Ms. Eaton and the then-Vice President of the School Board subsequently communicated that information to the rest of the School Board.

125. Upon information and belief, Ms. Eaton and the rest of the then-members of the School Board subsequently met behind closed doors to deliberate on Mr. Lopez's leave.

126. Upon information and belief, that meeting took place between November 14, 2025, and November 30, 2025.

127. Upon information and belief, Ms. Eaton and the rest of the then-members of the School Board decided at that time to continue Mr. Lopez's leave, indefinitely, and instructed Dr. Miles to communicate the same to Mr. Lopez.

128. Upon information and belief, Ms. Eaton and the rest of the then-members of the School Board also instructed Dr. Miles to reassign all of Mr. Lopez's duties to other members of the senior leadership team.

23

**The District's Perpetuation of Its Misconduct**

129.   At 8:09 a.m. on December 1, 2025, Mr. Lopez emailed Dr. Miles asking if he should attend the regularly scheduled cabinet meeting at 8:30 a.m. that morning

130.   Dr. Miles replied at 8:15 a.m. that Mr. Lopez should not attend the cabinet meeting but should attend a meeting with Dr. Miles and Mr. Monskie at 10:00 a.m.

131.   At 10:00 a.m. that morning, Mr. Lopez met with Dr. Miles and Mr. Monskie.

132.   The meeting lasted a total of three minutes.

133.   Mr. Lopez reiterated his intent to remain in his capacity as Assistant Superintendent with the District.

134.   Dr. Miles asked Mr. Lopez what he meant when he allegedly said, "I can't do this anymore."

135.   Mr. Lopez stated that if he had said something along those lines, it was about making decisions without using data.

136.   Mr. Lopez also clearly stated that he never said anything about resigning and that he had no intent of resigning.

137.   Mr. Lopez again reiterated that he wished to be reinstated, and Dr. Miles responded that Mr. Lopez would remain on leave while the District determined next steps.

138. Neither Dr. Miles nor Mr. Monskie provided Mr. Lopez with any written charges before, during, or after the meeting.

139. Mr. Monskie took contemporaneous notes of this meeting as well, true and correct copies of which are attached hereto as "**Exhibit I**."

140. Within hours of the meeting, Dr. Miles assigned two of Mr. Lopez's direct reports to report to alternative supervisors and otherwise reassigned his duties, effectively eliminating Mr. Lopez's position.

141. As of the date of this filing, Mr. Lopez remains on administrative leave.

142. Mr. Lopez still has not received anything in writing from the District identifying the purported basis for his administrative leave.

143. In fact, no one from the District has told Mr. Lopez when, if ever, his administrative leave will end.

**Defendants' Willful Violation of Mr. Lopez's Constitutional, Statutory, and Contractual Rights Has Substantially Harmed Mr. Lopez**

144. Mr. Lopez has been harmed in almost immeasurable ways because of Dr. Miles', the District's, and all nine members of the School Board's violation of Mr. Lopez's constitutional, statutory, and contractual rights.

145. Mr. Lopez's placement on administrative leave has created a stigmatizing effect among his colleagues, District students, District parents, and within the educational community at large.

146. That stigma was exacerbated by the District's circulation of a video among all District staff on or around February 25, 2026, wherein Dr. Miles erroneously referred to Mr. Lopez's months' long absence from the District as a "personnel matter."

147. Upon information and belief, that video generated speculation among Mr. Lopez's colleagues—and anyone else who viewed the video—that he engaged in some sort of wrongdoing, causing further reputational harm to Mr. Lopez.

148. Because Mr. Lopez remains on administrative leave to this day, that reputational harm to him persists.

149. Beyond that ongoing stigma, Mr. Lopez is unable to perform his duties under the Employment Agreement due to his continued forced absence from the District.

150. Mr. Lopez has yet to receive any documentation relative to his indefinite leave or otherwise be afforded any due process rights by the District.

151. A majority of the School Board has not voted at a duly noticed public meeting to place Mr. Lopez on indefinite administrative leave.

152. Nonetheless, Dr. Miles, acting at the direction of the School Board upon information and belief, effectively eliminated Mr. Lopez's position by reassigning his duties to other members of the District's senior leadership team.

26

153. That development is significant because, given his unblemished performance record, Mr. Lopez reasonably expected to earn another four-year contract from the District as an Assistant Superintendent—for a total value of over $1.1 million.

154. Indeed, the loss of PSERS benefits alone will result in Mr. Lopez's pension being reduced by $3,500 per month for the rest of his life and impact his PSERS projected contributions and interest balance by over $100,000.

155. But even if it is determined that Mr. Lopez's expectation is unreasonable, the reputational harm caused by him being placed on indefinite administrative leave without cause has substantially diminished Mr. Lopez's future earning capacity and likely foreclosed future employment opportunities for him.

156. In other words, Mr. Lopez will likely be forced into early retirement due to Defendants' misconduct, dramatically decreasing his pension and Social Security benefits, forcing him to absorb tens of thousands of dollars or more of unanticipated healthcare costs, and other damages.

157. All of this is in addition to the untold noneconomic damages that Mr. Lopez has suffered and will continue to suffer because of Defendants' misconduct, including, but not limited to, emotional distress, mental anguish, pain and suffering, embarrassment, and humiliation.

**CAUSES OF ACTION**

**COUNT I**
**Section 1983 – Procedural Due Process**
**(Mr. Lopez v. Defendant Miles)**

158.    Mr. Lopez incorporates the preceding paragraphs by reference as though fully set forth herein.

159.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."  U.S. CONST. amend. IX.

160.    Section 1983 of Title 42 of the United States Code establishes a private cause of action for violation of constitutional rights by state actors.  42 U.S.C. § 1983.

161.    Dr. Miles is a state actor for purposes of Section 1983.

162.    It is clearly established that individuals have a constitutionally protected liberty interest in their good name, reputation, and integrity, and cannot be deprived of those interests without due process of law.

163.    It further is clearly established that an assistant superintendent has a property right to his/her continued employment and cannot be deprived of the same without due process of law.

164. As set forth above, Dr. Miles deprived Mr. Lopez of his due process rights by, *inter alia*, failing to provide Mr. Lopez with notice and opportunity to be heard before placing him on indefinite administrative leave.

165. In doing so, Dr. Miles deprived Mr. Lopez of his liberty and property interests without affording him basic due process protections, including, but not limited to, his right to a fair and impartial investigation, his right to a meaningful opportunity to be heard and present a defense, his right to present evidence and witnesses in support of his defense, his right to a fair adjudication, and his right to be heard before an impartial factfinder.

166. Accordingly, Dr. Miles is liable to Mr. Lopez for violations of the Due Process Clause of the Fourteenth Amendment and for all damages arising therefrom.

167. As a direct and proximate cause of Dr. Miles' conduct, Mr. Lopez has suffered and continues to suffer ongoing harm, including, but not limited to, mental and emotional distress; damage to his reputation; delayed and diminished future earning capacity; loss of future employment; litigation expenses including attorney's fees; and tremendous other economic and noneconomic damages.

168. Dr. Miles acted willfully, maliciously, and with reckless disregard of Mr. Lopez's rights, entitling him to recover punitive damages.

**COUNT II**
**Section 1983 – Procedural Due Process**
**(Mr. Lopez v. Defendants Eaton, Goodson, Henderson, Holmes, McGrann,**
**Morales, Parry, Pilkerton-Plumb, and Rios)**

169.   Mr. Lopez incorporates the preceding paragraphs by reference as though fully set forth herein.

170.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."  U.S. CONST. amend. IX.

171.   Section 1983 of Title 42 of the United States Code establishes a private cause of action for violation of constitutional rights by state actors.  42 U.S.C. § 1983.

172.   Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios are each state actors for purposes of Section 1983.

173.   It is clearly established that individuals have a constitutionally protected liberty interest in their good name, reputation, and integrity, and cannot be deprived of those interests without due process of law.

174.   It further is clearly established that an assistant superintendent has a property right to his/her continued employment and cannot be deprived of the same without due process of law.

175.   As set forth above, Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios, independently and collectively, deprived Mr. Lopez of his due process rights by, *inter alia*, failing to provide Mr. Lopez with notice and opportunity to be heard before continuing his indefinite administrative leave.

176.   In doing so, Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios, independently and collectively, deprived Mr. Lopez of his liberty and property interests without affording him basic due process protections, including, but not limited to, his right to a fair and impartial investigation, his right to a meaningful opportunity to be heard and present a defense, his right to present evidence and witnesses in support of his defense, his right to a fair adjudication, and his right to be heard before an impartial factfinder.

177.   Accordingly, Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios are liable to Mr. Lopez for violations of the Due Process Clause of the Fourteenth Amendment and for all damages arising therefrom.

178.   As a direct and proximate cause of the conduct of Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios, Mr. Lopez has suffered and continues to suffer

31

ongoing harm, including, but not limited to, mental and emotional distress; damage to his reputation; delayed and diminished future earning capacity; loss of future employment; litigation expenses including attorney's fees; and tremendous other economic and noneconomic damages.

179.    Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios acted willfully, maliciously, and with reckless disregard of Mr. Lopez's rights, entitling him to recover punitive damages.

## COUNT III
### Breach of Contract
### (Mr. Lopez v. Defendant School District)

180.    Mr. Lopez incorporates the preceding paragraphs by reference as though fully set forth herein.

181.    As noted above, the District entered into the Employment Agreement with Mr. Lopez.

182.    The Employment Agreement is a valid and enforceable contract.

183.    The District has breached and continues to breach the Employment Agreement by refusing to allow Mr. Lopez to perform his duties under the Agreement.

184.    The District has also breached and continues to breach the Employment Agreement by placing and keeping Mr. Lopez on indefinite administrative leave.

32

185. As a direct and proximate result of the District's breaches of the Employment Agreement, Mr. Lopez has suffered and will continue to suffer harm.

## COUNT IV
### Tortious Interference with Contractual Relations
### (Mr. Lopez v. Defendant Miles)

186. Mr. Lopez incorporates the preceding paragraphs by reference as though fully set forth herein.

187. A valid contract exists between Mr. Lopez and the District in the form of Mr. Lopez's Employment Agreement.

188. Dr. Miles was aware of Mr. Lopez's contractual obligations to the District.

189. Despite that knowledge and acting outside the scope of his employment, Dr. Miles facilitated and encouraged the District to breach its corresponding contractual obligations to Mr. Lopez.

190. Dr. Miles acted with specific intent to cause harm to Mr. Lopez.

191. Dr. Miles lacked any privilege or justification that would permit him to interfere with the District's contractual obligations to Mr. Lopez.

192. As a direct and proximate result of Dr. Miles' tortious interference, Mr. Lopez has suffered and will continue to suffer damages.

193. Dr. Miles acted willfully, maliciously, and with reckless disregard of Mr. Lopez's rights, entitling him to recover punitive damages.

33

**COUNT V**
**Violation of the Sunshine Act**
**(Mr. Lopez v. Defendants Eaton, Goodson, Henderson, Holmes, McGrann, Morales, Parry, Pilkerton-Plumb, and Rios)**

194. Mr. Lopez incorporates the preceding paragraphs by reference as though fully set forth herein.

195. School boards are public agencies subject to Pennsylvania's Sunshine Act. 65 Pa.C.S. § 701.

196. All school board meetings at which official action is to be taken or deliberated shall take place at a meeting open to the public, except for executive sessions. *Id.* § 704.

197. A majority of the School Board has not voted at a duly noticed public meeting to place Mr. Lopez on indefinite administrative leave.

198. Instead, and as set forth above, all of the then-members of the School Board met behind closed doors to deliberate on Mr. Lopez's leave between November 14, 2025, and November 30, 2025; they decided to continue his leave, indefinitely; and they instructed Dr. Miles to communicate the same to Mr. Lopez, either directly or through Solicitor Litts, upon information and belief.

199. Accordingly, Ms. Eaton, Ms. Goodson, Dr. Henderson, Ms. Holmes, Ms. McGrann, Mr. Morales, Dr. Parry, Ms. Pilkerton-Plumb, and Ms. Rios, independently and collectively, violated the Sunshine Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Christopher Lopez requests that this Court enter judgment in his favor and against Defendants School District of Lancaster, Jennifer Eaton, Robin Goodson, Molly Henderson, Ed.D., Katrina Holmes, Mara Creswell McGrann, Keith Miles, Jr., Ed.D., Luis Morales, David Parry, Ph.D., Anita Pilkerton-Plumb, and Kareena Rios, jointly and severally, and grant the following relief:

   a.   Award compensatory and other economic damages to Mr. Lopez in an amount to be determined at trial, including an award of prejudgment interest;

   b.   Award noneconomic damages to Mr. Lopez in an amount to be determined at trial;

   c.   Award punitive damages to Mr. Lopez for Counts I, II, and IV;

   d.   Grant attorneys' fees and costs to Mr. Lopez; and

   e.   Order such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Christopher Lopez respectfully demands a trial by jury of all issues triable by a jury in this case.

35

Respectfully submitted,

BABST CALLAND, CLEMENTS AND ZOMNIR P.C.

*/s/ Casey Alan Coyle*
Casey Alan Coyle, Esquire
PA ID No. 307712
Morgan M. Madden, Esquire
PA ID No. 324351
Theresa Davis, Esquire
PA ID No. 331845
300 N. 2nd Street, Suite 801
Harrisburg, PA 17101
(717) 868-8377
ccoyle@babstcalland.com
mmadden@babstcalland.com
tdavis@babstcalland.com
*Counsel for Plaintiff Christopher Lopez*

Dated: April 23, 2026

36

# EXHIBIT A

Ashley Stalnecker, "Assistant superintendent sues SDL and board, claims superintendent wrongfully placed him on leave," LNP (Dec. 10, 2025)

https://lancasteronline.com/news/local/assistant-superintendent-sues-sdl-and-board-claims-superintendent-wrongfully-placed-him-on-leave-update/article_c9cea727-9ef8-4cf1-b1a9-c791e9e47d7a.html

# Assistant superintendent sues SDL and board, claims superintendent wrongfully placed him on leave [update]

 [ASHLEY STALNECKER](#) | Staff Writer

Dec 10, 2025



School District of Lancaster Superintendent Keith Miles Jr. during the NAACP Lancaster Branch's 100th anniversary gala at the Holiday Inn Lancaster on Thursday, Sept. 21, 2023, in downtown Lancaster.

Connor Hollinger | LNP Correspondent

Welcome to LNP! You have 1/2 free article views remaining.                    LOGIN

***Editor's note:*** *This story has been updated to include a response from School District of Lancaster board President Jennifer Eaton.*

---

An assistant superintendent is suing the School District of Lancaster claiming Superintendent Keith Miles wrongfully placed him on indefinite leave and is improperly seeking to terminate his position.

In a <u>lawsuit filed Friday in Lancaster County Court</u>, attorneys for Christopher Lopez say their client has an "unblemished performance record" and is "the target of an unjustified and unprovoked campaign by (Miles) to remove him from the district."

Lopez's suit asks the district to return him to his duties and to provide any "further relief that the court deems just" according to the suit. Lopez declined to comment on the suit or his employment status Wednesday morning.

Attorneys Casey Alan Coyle and Morgan M. Madden, of the Harrisburg-based law firm Babst, Calland, Clements and Zomnir P.C., are representing Lopez. Jeffrey Litts, of the Lancaster city-based law firm Saxton and Stump, is representing the district and school board. None of the attorneys returned calls requesting comment on Wednesday.

District spokesperson Adam Aurand called Lopez's lawsuit "one-sided."

"(T)he district will honor its long-standing practices not to discuss internal personnel matters publicly out of respect for the institution and those involved," Aurand wrote Wednesday in an email statement. "We will respond in the appropriate venue."

Aurand said Lopez remains on administrative leave and that there is no plan for the suit or the status of his employment to be on the agenda at the next district's upcoming school board meeting.

School board President Jennifer Eaton wrote in an email Wednesday that the school board has been kept "regularly apprised of this matter from the beginning."

"As is our practice," Eaton said, "the board will continue to keep personnel matters private."

Miles did not immediately respond to a request for comment Wednesday.

The suit, citing a state Supreme Court ruling, alleges the district and board violated Pennsylvania School Code because only "a school board may implement interim suspensions with or without pay in the face of allegations of serious misconduct."

Lopez has been employed by the nearly 10,000-student city school district for 27 years.

He began his tenure as a paraprofessional and, according to the suit, "worked his way up the proverbial ladder" until August 2024, when he was hired as an assistant superintendent responsible for student services. The new position came with a $185,000 annual salary, Aurand previously told LNP | LancasterOnline.

## Suit describes meeting with Miles, Lopez

The lawsuit describes a Nov. 12, one-on-one meeting between Lopez and Miles, who was hired as district superintendent in 2023 over community objections to the board's decision to replace interim Superintendent Matthew Przywara, who served as chief financial officer and assistant superintendent over his 17-year career in the district.

At the meeting, the suit says Lopez challenged a suggestion by Miles to "further reduce" district staffing and "expressed frustration at those anticipated cuts." An email written by Litts and included as an exhibit in the suit claims Lopez "yelled at his direct supervisor" when told "personnel changes would be occurring."

Following the meeting, the lawsuit says, Miles arranged a follow-up meeting two days later with Lopez and district Chief Human Resources Officer Gregory Monskie. During the second meeting, Miles told Lopez he "doesn't think it's working out" and suggested an "amicable split with the organization," according to Lopez's lawsuit.

Miles told Lopez to take the weekend following that meeting to consider "what a separation might look like from a nonpublic situation," according to an email Monskie sent transcribing his notes from the meeting. The email was included in the suit's appendix.

According to Monskie's email, Miles told Lopez that it "doesn't seem like he's willing to make concessions as we go into this period of reduction" and that Lopez was not "aligned to the organization."

The district has long struggled with budget problems. It was a winning plaintiff in a successful lawsuit that argued Pennsylvania is not meeting its constitutional requirement to fund all schools fairly.

This year, the nine-member, all-Democratic school board approved a significant property tax increase, 4.25%, to overcome a $29 million budget deficit. Even with the tax hike, the district budget called for cutting nine staff positions to avoid dipping into its $6.4 million fund balance.

The district board held a committee of the whole meeting Tuesday where members disclosed they had met in executive session. Lopez's lawsuit was not discussed during the public portion of the meeting.

The next opportunity the community has to address the board in public comment will be next Tuesday at 6:30 p.m. The board is scheduled to meet in the Lincoln Middle School boardroom at 1001 Lehigh Ave. in Lancaster. An agenda for the meeting is not yet posted; public governing bodies are required to post meeting agendas at least 24 hours in advance.

[SCRIBD]

Download this PDF                    1 / 43

SDL Lawsuit by Ashley Stalnecker

---

***Want alerts sent to your inbox when news breaks?*** *Sign up for our free Breaking News newsletter here.*

Local News
**State funding 'not keeping up with reality' for Lancaster County school districts**

# <u>EXHIBIT B</u>

Employment Agreement

## EMPLOYMENT AGREEMENT FOR ASSISTANT SUPERINTENDENT

THIS AGREEMENT is made and entered this 20th day of August 2024, by and between the Board of School Directors of the School District of Lancaster (hereinafter referred to as "School District") and Christopher N. Lopez (hereinafter referred to as "Assistant Superintendent").

WHEREAS, the Board of School Directors (hereinafter "Board") of the School District of Lancaster, at a regularly scheduled meeting duly and properly called on the 20th day of August 2024, did appoint Christopher N. Lopez, to the office of Assistant Superintendent for the School District in accordance with the provisions of Sections 508, 1071, 1073, and 1076 of the Public School Code of 1949, as amended, 24 P.S. §§ 5-508, 10-1071, 10-1073 and 10-1076 ; and

WHEREAS, the parties have agreed upon certain terms and conditions of employment and desire to reduce said terms and conditions to writing;

Intending to be legally bound and in consideration of the mutual covenants herein contained, the parties agree as follows:

1.     Employment. The School District employs the Assistant Superintendent, and the Assistant Superintendent accepts employment, under the terms and conditions of this Agreement.

2.     Terms of Employment. The term of employment of the Assistant Superintendent pursuant to this Agreement shall commence on August, 21, 2024 and shall continue until August 20, 2028 unless terminated sooner pursuant to the provisions of this Agreement. This Agreement shall terminate on August 30, 2028 unless the Agreement is renewed for an additional term pursuant to Section 1077 of the Public School Code of 1949, as amended, 24 P.S. § 10-1077.

3.     Professional Certification. As a condition precedent to this Agreement, the Assistant Superintendent shall hold and maintain a valid Letter of Eligibility issued by the Department of Education, Commonwealth of Pennsylvania. The Assistant Superintendent covenants that he possesses all the qualifications that are required by law to serve as the Assistant Superintendent at the beginning of his term of employment under this Agreement. If the Assistant Superintendent does not possess, hold or maintain the necessary credentials to serve as Assistant Superintendent throughout his employment term this Agreement shall be null and void.

4.     Duties and Nature of Service.

a)     The Assistant Superintendent is employed as the Assistant Superintendent of the School District. In addition to those duties and powers conferred by law, the Assistant Superintendent shall (subject to the control and direction of the Board) perform such duties as assigned to him by the Board and/or by the Superintendent as set forth in Section 1082 of the Public School Code. 24 P.S. § 10-1082.

b)     The Assistant Superintendent shall devote the Assistant Superintendent's full working time and best efforts to the performance of the Assistant Superintendent's duties as Assistant Superintendent for the School District. The Assistant Superintendent so long as

consistent with performance of the Assistant Superintendent's duties, may with the prior approval of the Superintendent (i) attend seminars, conferences and conventions related to the duties of the Assistant Superintendent's position or the activities of School District and (ii) undertake consultation work, speaking engagements, writing, lecturing, or other professional duties and obligations, with or without honorarium, provided that the Assistant Superintendent shall not accept any honorarium that has not been previously disclosed to the Superintendent prior to undertaking the consultation work, speaking engagement, writing, lecturing or other professional duties and obligations.

5.          Compensation.

a)          As compensation for the Assistant Superintendent's services and performance of his obligations under this Agreement, the School District shall pay to the Assistant Superintendent an annual salary at the rate of $185,000 per fiscal year, starting with 2024-2025 school year, payable on School District's customary salary payment dates. Such salary shall be evaluated annually and may be increased from time to time at the discretion of the Board. In addition, upon attaining mutually agreed upon objectives, the Assistant Superintendent shall be entitled to incentive pay in an amount determined at the discretion of the Board.

b)          In addition to the other compensation and benefits provided in this Agreement and except as otherwise provided herein, the Assistant Superintendent shall, in addition to the fringe benefits specifically included or referenced herein, be entitled to any fringe benefits (including post-retirement benefits) set forth in the School District's Act 93 Administrative Compensation Plan adopted pursuant to Section 1164 of the Public School Code of 1949, as amended 24 P. S. § 11-1164 ("Act 93 Plan") in effect on the commencement of this Agreement. If the fringe benefits under the School District's Act 93 Administrative Compensation Plan are increased, then the fringe benefits of the Assistant Superintendent shall be increased in the same manner.

c)          In addition to the fringe benefits described in subparagraph (b) above, the Assistant Superintendent shall be entitled to the following benefits:

(i)          Conferences and Conventions. The School District shall (A) so long as consistent with the performance of his duties and with the prior approval of the Superintendent, provide the Assistant Superintendent with a reasonable amount of release time for the Assistant Superintendent's attendance at national and state conferences and conventions and (B) reimburse the Assistant Superintendent for costs reasonably and necessarily incurred to attend and participate in such conferences and conventions.

(ii)          Indemnification. In accordance with, and subject to, the provisions of the Political Subdivision Tort Claims Act, the Board shall defend, hold harmless and indemnify the Assistant Superintendent from demands, claims, suits, actions and legal proceedings brought against the Assistant Superintendent as agent and/or employee of the Board and/or School District, so long as the Assistant Superintendent does not engage in willful misconduct as that term is construed

-2-

and understood under the Political Subdivision Tort Claims Act. This obligation shall survive the termination of this Agreement.

(iii)    Section 403(b) Plan. The Assistant Superintendent shall be entitled to participate in the 403(b) tax sheltered annuity plan sponsored by the School District, as amended from time to time, and shall be eligible for all benefits offered under such plan. The School District will match fifty (50) cents on each dollar invested by the Assistant Superintendent up to five percent (5%) of his annual salary each fiscal year.

(iv)    Life/Disability Insurance. During the term of this Agreement, the School District shall provide the Assistant Superintendent with a term life insurance policy in the amount of two and one-half (2.5) times the annual salary of the Assistant Superintendent, and with a short-term disability insurance policy in the amount of 66 and 2/3rds of his annual salary (covering two years after the exhaustion of other paid leave).

(v)    Continuing Education and Professional Development. The District shall pay the full cost for the Assistant Superintendent's continuing education and professional development activities, including but not limited to leadership coaching, provided that such activities are approved in advance by the District Superintendent.

(vi)    Taxable, Non-PSERS Benefits Stipend. The Assistant Superintendent shall receive each fiscal year the amount of $2,500, which shall be taxable as income but not eligible for PSERS credit, to be utilized at the discretion of the Assistant Superintendent toward the purchase of additional employment benefits, and the payment of which shall be allocated among and added to the Assistant Superintendent's regular salary payments.

6.    Formal Written Performance Evaluation.

a)    No later than March 1 of each fiscal year, the Assistant Superintendent shall provide a written self-assessment to, the School District's Superintendent, and the Board. On or before April 1 of each fiscal year, the Board, the School District's Superintendent, and the Assistant Superintendent shall meet in closed executive session for the purpose of evaluation of the performance of the Assistant Superintendent. The Superintendent, in conjunction with the Board shall complete a written evaluation by June 1 of each fiscal year and shall use a mutually agreed upon method as the basis for said evaluation. Any assessment system selected shall require the Superintendent and the Board to speak in one voice.

b)    In the event it is determined that the performance of the Assistant Superintendent is unsatisfactory in any respect, the evaluation shall describe in writing and, in reasonable detail, the specific instances of unsatisfactory performance. A copy of the written evaluation shall be delivered to the Assistant Superintendent on or before June 30 of each year during the term of this Agreement. The Assistant Superintendent shall have the right to make a

-3-

written response to the evaluation. The evaluations and the Assistant Superintendent's responses shall be totally confidential, private and in no manner become public knowledge or conversation. The parties shall have the mutual right to waive a formal performance evaluation in any year of the Agreement provided; however, that the Assistant Superintendent's performance shall be deemed satisfactory and the Assistant Superintendent shall not be subject to discipline, discharge or removal on the basis of neglect of duty or incompetency in any year in which there is no evaluation. The parties shall attempt in good faith to comply with the foregoing milestone dates, but the evaluation process shall continue and the performance evaluation shall be valid even if there is delay in meeting such dates. In the event of delay, the parties shall in good faith attempt to agree upon an extension of time for the evaluation process.

c) In accordance with Section 1073.1 of the Public School Code of 1949, as amended, 24 P.S. § 1073.1, the Superintendent in conjunction with the Board and the Assistant Superintendent shall agree on objective performance standards for use in the performance evaluation of the Assistant Superintendent. The parties shall agree upon such objective performance standards within 90 days of the Assistant Superintendent's appointment and thereafter prior to July 1 of each year. The objective performance standards shall be in writing, approved and executed by both parties, and shall be made a part of this Agreement. As required by Section 1073.1(b. l) of the Public School Code, the written objective performance standards and whether the Assistant Superintendent met the agreed-to objective performance standards shall be posted in the School District's publicly accessible Internet website.

7. Termination of Agreement. This Agreement may be terminated upon any of the following events:

a) Agreement. This Agreement may be terminated by the mutual agreement of The Assistant Superintendent and the Board. Any such agreement that provides for severance compensation shall be in writing and subject to provisions of Section 1073(e)(3) of the Public School Code, as amended, 24 P.S. § 10-1073(e)(3).

b) Resignation/Retirement. This Agreement will be terminated upon the resignation or retirement of the Assistant Superintendent. The Assistant Superintendent shall provide at least ninety (90) days advance written notice of his resignation or retirement, unless such notification is waived by the Board.

c) Disability of The Assistant Superintendent. In the event that the Assistant Superintendent is disabled and unable to perform his duties for a period of three (3) consecutive months, then the School District may, by notice to the Assistant Superintendent given prior to the date the Assistant Superintendent is able to resume performance of his duties, terminate this Agreement.

d) Termination for Cause. The Assistant Superintendent's employment may be terminated for cause. The Assistant Superintendent shall be subject to discharge for a valid and just cause for the reasons specified in Section 1080 of the Public School Code, as amended, 24 P.S. § 10-1080. The Board shall

-4-

not arbitrarily or capriciously call for the Assistant Superintendent's dismissal, and the Assistant Superintendent shall, in any event, have the right to written charges, notice of hearing, fair and impartial hearing, all elements of due process, and the right to appeal to a court of competent jurisdiction. At any such hearing before the Board, the Assistant Superintendent shall have the right to be present and to be heard, to be represented by counsel, and to present evidence, through witnesses and testimony, relevant to the issue. A transcript of the record of proceedings before the Board shall be made available without charge to the Assistant Superintendent. The Assistant Superintendent shall have the right to be represented by counsel at his sole cost and  expense during any termination proceedings.

e) <u>Death</u>.  This Agreement shall be terminated in the event of the death of the Assistant Superintendent.

8.      <u>Renewal</u>.  The Assistant Superintendent will advise the Board in writing at least six (6) months prior to the end of this Agreement as to his wish concerning extension and continued employment after the term of this Agreement.  Likewise, the Board will deliberate in executive session, and notify The Assistant Superintendent at least six (6) months prior to the end of this Agreement whether there appears to be a general consensus among its members to continue or discontinue the relationship – however, this shall not constitute "official action" of the Board, and shall not in any manner be binding upon the Board.  Any continuation of this Agreement beyond the duration stated herein shall require formal School Board approval at a public meeting.  If the Board fails to take official action on the Assistant Superintendent's employment status at least ninety (90) days prior to the expiration of his employment term, the Assistant Superintendent's employment shall be extended one time for a one-year period pursuant to the terms outlined in this Agreement.

9.      <u>Sick Leave</u>.  The Assistant Superintendent shall be credited with twelve (12) days of sick leave on July 1st of each year of this Agreement.  The Assistant Superintendent shall be credited with 99.50 sick leave days he had accumulated as of the date of this Agreement during his School District employment.  If the Assistant Superintendent has more than 100 accumulated sick leave days at the time of his annual allotment of sick leave days, The Assistant Superintendent shall forego the receipt of the allotted sick leave days and, in lieu of the same, receive a non-elective contribution to his 403(b) tax-deferred account that equals his then-current per diem rate of pay for each unused day of sick leave above his accumulated 100 days.  However, the amount paid by the School District for any year shall not exceed the contribution limits of § 415(c)(1) of the Internal Revenue Code.  If the amount due under this paragraph for any year exceeds the applicable contribution limit for any year, the unpaid amount shall be contributed into the Assistant Superintendent's tax deferred account in the next year to the extent permitted under the applicable limitations, and shall continue in each succeeding year until the entire amount due has been contributed into the Assistant Superintendent' s tax deferred account. Upon separation or termination of employment, the Assistant Superintendent shall receive payment for all unused days of sick leave, up to a maximum of one hundred (100) days in accordance with Act 93 administrator compensation plan.

-5-

10.     Vacation Leave. The Assistant Superintendent shall be credited with twenty (20) days of vacation leave on July 1st of each year of this Agreement. The Assistant Superintendent shall be credited with the 37.50 vacation leave days he had accumulated as June 30, 2023 during his School District employment, subject to the limitations specified herein. The Assistant Superintendent may accumulate a maximum of forty (40) vacation days. As of June 30th of each year, the Assistant Superintendent may elect the option of being paid at his then-current per diem rate of pay for up to ten (10) unused vacation days each year of this Agreement. Any such election shall be submitted in writing to the Superintendent for processing. Upon separation or termination of employment, the Assistant Superintendent shall receive payment at this then-current per diem rate of pay for all unused days of vacation leave, up to a maximum of forty (40) days.

11.     Waiver of Breach. The waiver by School District of due performance of, or compliance with, any provisions of this Agreement by The Assistant Superintendent shall not operate or be construed as a waiver of due performance or compliance by The Assistant Superintendent thereafter.

12.     Severability. If any provision of this Agreement shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair, or invalidate the remainder of this Agreement.

13.     Headings. The headings in this Agreement are for convenience only and shall not be considered as part of this Agreement.

14.     Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

15.     Entire Agreement/Modification. This Agreement sets forth the entire understanding of School District and the Assistant Superintendent with respect to the subject matter of this Agreement. No waiver, change or modification of any of the terms of this Agreement shall be binding unless in writing and signed by both parties to this Agreement.

IN WITNESS WHEREOF, School District and The Assistant Superintendent have signed this Agreement.

SCHOOL DISTRICT OF LANCASTER

By: _____     Date: 8/20/24
    School Board President

By: _____     Date: 8-20-24
    Christopher N. Lopez

-6-

# EXHIBIT C

## 2024–2025 Final Evaluation for Mr. Christoper Lopez



**2024-2025 Final Evaluation for Mr. Christopher Lopez**

Lancaster School District
251 South Prince Street
Lancaster, PA 17603
717-299-2700

Performed on 5/30/25, 10:40 PM
Performed by Dr. Keith Miles

## OPS  Objective Performance Standards

### OPS 1  Goal 1-Chronic Absenteeism

**2a. Implement and assess regular systems and practices that respect different cultures to help students and staff feel comfortable, cared for, and secure in school in all aspects: socially, emotionally, intellectually, and physically.**

| Key Indicator | Baseline | Target | Failing | Some Progress | Met Target | Exceeded Target |
|---|---|---|---|---|---|---|
| **Percentage of students who are chronically absent as of April 1, 2025** | 27.6% | 26.6% | <27.6% | 27.5%-26.7% | 26.6% | >25.6% |

**Exceeded Target**

*Evidence exceeds the established objective performance standard. Actual performance exceeds the target metric.*

***Feedback and Comments***

The target was less than 26.6%, and the percentage of students chronically absent was 25.4, exceeding the target.
Dr. Keith Miles, Superintendent - 5/30/2025, 10:04:44 PM
  - *Dr. Keith Miles*

October 16, 2024

| Metric | 2023-2024 | 2024-2025 | Percentage Point Change |
|---|---|---|---|
| % Chronically Absent | 25.2% | 22.4% | -2.8% |
| % Habitually Truant (6+ Unexcused Absences) | 7.8% | 5.6% | -2.2% |
| % Truant (3-5 Unexcused Absences) | 9.1% | 9.2% | 0.1% |
| Attendance Rate | 92.3% | 93.1% | 0.8% |

November 7, 2024

| Metric | 2023-2024 | 2024-2025 | Percentage Point Change |
|---|---|---|---|
| % Chronically Absent | 23% | 20.7% | -2.3% |
| % Habitually Truant (6+ Unexcused Absences) | 10.9% | 9% | -1.9% |
| % Truant (3-5 Unexcused Absences) | 12.4% | 12.2% | 0.2% |
| Attendance Rate | 92% | 92.8% | 0.8% |

  - *Mr. Christopher Lopez*

***Supporting Evidence***

 Evaluation Evidence Collection 24-25 (https://docs.google.com/document/d/1leBGBBfcbo8A7Z1hQlKTKAsevmWUpXEUVTvCHChRmVs/edit?tab=t.0)

 December Attendance Update Lopez

 Chronic Absenteeism Resources

 Extended Day Program AL Revised

 Friday Letter Chronic Absenteeism

 Building Visits

 24 25 Climate & Discipline Communication

Attendance Materials Campaign

Attendance Teaming Expectations

## OPS 2  Goal 2-MTSS Plans

**2a. Implement and assess regular systems and practices that respect different cultures to help students and staff feel comfortable, cared for, and secure in school in all aspects: socially, emotionally, intellectually, and physically.**

| Key Indicator | Baseline | Target | Failing | Some Progress | Met Target | Exceeded Target |
|---|---|---|---|---|---|---|
| **# of unique students with Skills-Based Behavior & Social-Emotional MTSS Plans as of April 1, 2024** | 370 | 389 | <370 | 371-388 | 389 | >400 |

**Exceeded Target**

*Evidence exceeds the established objective performance standard. Actual performance exceeds the target metric.*

### Feedback and Comments

The target was at least 389 unique students with plans, and there were 664 unique students with plans, exceeding the target.
Dr. Keith Miles, Superintendent - 5/30/2025, 10:08:37 PM
  - *Dr. Keith Miles*

School Climate Coordinators, building leaders and school teams contribute to the creation of support plans for students.  This has been an ongoing effort over the years.  Clear expectations and systems for support have allowed us the exceed our goal, and more importantly, improve student outcomes.
The following were contributors to exceeding this goal:

1. MTSS Leadership Workshop, Summer 2025
2. New SDoL Universal MTSS Academic and Behavior Manual (2 year project)
3. Tier 1 Behavioral Differentiation Building-Level Training (September/October)
4. Synergy Documentation Training
5. Coordinator of School Climate weekly/monthly coaching at Advanced Tiers Meetings
6. MTSS Data Dashboards from Office of Data Analytics
7. RULER Student Implementation - Development of a strong Tier 1 SEL framework
8. Monthly Dean/TSTL networking meetings
9. Tier 1.5 Strategy Menus
10. Tier 2 Intervention Menu
11. Tier 3 Intervention Menu
12. Collaboration with CIA, Special Education, Assistant Directors in Student Services
     - *Mr. Christopher Lopez*

### Supporting Evidence

 U44779 24 25 SDOL MTSS BEHAVIOR MANUAL

 U44779 24 25 SDOL MTSS BEHAVIOR MANUAL (1)

 U44779 MTSS Communication 10 30 24

 U44779 Student Support Plan

 U44779 January RULER Communication

## OPS 3  Goal 3-Phoenix Integration Plan

**2a. Implement and assess regular systems and practices that respect different cultures to help students and staff feel comfortable, cared for, and secure in school in all aspects: socially, emotionally, intellectually, and physically.**

| Key Indicator | Baseline | Target | Failing | Some Progress | Met Target | Exceeded Target |
|---|---|---|---|---|---|---|
| **Plan developed to integrate Phoenix Academy students in McCaskey High School** | N/A | Plan Created | No Plan Created | Partial Plan Created | Plan Created | Plan Created + 3 identified action steps taken |

**Exceeded Target**

*Evidence exceeds the established objective performance standard. Actual performance exceeds the target metric.*

### Feedback and Comments

Chris not only developed an appropriate integration plan, but also executed many (>3) implementation steps by moving the Phoenix Middle school students into McCaskey already this year.
Dr. Keith Miles, Superintendent - 5/30/2025, 10:12:36 PM
   *- Dr. Keith Miles*

We have created and implemented a plan for middle school students to attend McCaskey.  Students' first day was March 25, 2025.  The planning and transition required collaboration with students, parents, Phoenix staff, Central Office, and the High School Principal.  In addition, we have been working to create a long-term plan providing options to transition students in phases over the next year or two, while maintaining our partnership with our SESI at Phoenix providers.  A proposal for Board consideration is being prepared with a target deadline of May 14, 2025.
   *- Mr. Christopher Lopez*

### Supporting Evidence

Phoenix Relocation Plan

## OPS 4  2c. Projected Graduates

**Percentage of students identified as Grade 12 on September 1 who graduate by June 2025**

| Key Indicator | Baseline | Target | Failing | Some Progress | Met Target | Exceeded Target |
|---|---|---|---|---|---|---|
| Percentage of students identified as Grade 12 on September 1 who graduate by June 2025 | 79.2% | 81.2% | <79.2% | 79.3%-81.1% | 81.2% | >83.0% |

**Exceeded Target**

*Evidence exceeds the established objective performance standard. Actual performance exceeds the target metric.*

### Feedback and Comments

The target was 81.2%, and the percentage of students identified as Grade 12 on September 1 who graduated was 95%, exceeding the target.
Dr. Keith Miles, Superintendent - 5/30/2025, 10:14:19 PM
   *- Dr. Keith Miles*

We are waiting for end of year data.
   *- Mr. Christopher Lopez*

### Supporting Evidence

 U44779 Projected Grads As Of 2025 1 21

**Overall General Evaluation Comments**

*Chris Lopez had an exceptional year, exceeding all of the strategic plan goals under his oversight. His transition into the role of Assistant Superintendent was successful, demonstrating both competence and adaptability in assuming new responsibilities. Chris brought a valuable wealth of knowledge to the role, particularly in providing historical context that informed sound decision-making.*

*While he experienced some resistance in implementing certain aspects of his agenda, he navigated those challenges with a consistent focus on students. As he continues to grow in this leadership role, it will be important for him to further strengthen relationships with association leadership and his colleagues.*

*Chris exceeded all evaluation targets and earned an overall rating of Distinguished (3.0/3.0), reflecting his strong performance and positive impact this year.*

*Dr. Keith Miles, Superintendent - 5/30/2025, 10:27:53 PM*

   - Dr. Keith Miles

---

*The Office of Student Services in partnership with school and district leaders has worked collaboratively to exceed the goal set for the current school year.  Through regular communication around expectations, support,  and accountability, we have created systems and processes for supporting schools and students.  Our Climate Coordinators regularly share and review building-level data with leaders.  District and building- level data was also shared on an almost monthly basis celebrating successes along the way.  The Office of Data Analytics supported and reported regular reporting to the Board that was turned around and shared with leaders.*

   - Mr. Christopher Lopez

Employee's Signature:

*Mr. Christopher Lopez*

Mr. Christopher Lopez

(signed electronically)

Evaluator's Signature:

*Dr. Keith Miles*

Dr. Keith Miles

(signed electronically)

Date:

6/2/25

Date:

6/2/25

*Please Note:*

- *The employee's signature indicates that they have seen and discussed the evaluation; it does not necessarily denote agreement with the evaluation.*

# EXHIBIT D

Monskie Notes of 11/14/25 Meeting



---------- Original Message ----------
From: "Lopez, Christopher" <clopez@sdlancaster.org>
To: CHRIS LOPEZ <cnlopez@comcast.net>
Date: 12/01/2025 4:56 PM EST
Subject: Fw: Notes of Meeting w/ Chris Lopez and Keith Miles

---

**From:** Monskie, Gregory E. <gemonskie@sdlancaster.org>
**Sent:** Monday, December 1, 2025 4:11 PM
**To:** Lopez, Christopher <clopez@sdlancaster.org>
**Subject:** FW: Notes of Meeting w/ Chris Lopez and Keith Miles

As requested,

---

**From:** Monskie, Gregory E.
**Sent:** Friday, November 14, 2025 12:14 PM
**To:** Monskie, Gregory E. <gemonskie@sdlancaster.org>; Miles, Dr. Keith <keithmiles@sdlancaster.org>
**Subject:** Notes of Meeting w/ Chris Lopez and Keith Miles

Thanked for having the discussion. Said I'm a neutral party to be here and listen.

The role of AS is the most important in the organization. It's important modeling good leadership that strengthens the team.

1

When he elevated him, shared about culture issues on the 4th floor. Chris addressed them and was impressed when he addressed them and people noticed a change.

Success is important and Miles says provided a lot of support with executive coaching. Book study is also working through it. Both he and April were brought on at the same time and thought would be a mentor. Thought he would grow into the roll. Weekly check-ins are all support.

Despite all of that, he doesn't think its working out. Others expressed concerns prior to his elevation and Miles wanted to make his own determination.

Chris's reaction in the last meeting is an example of what he's heard all along. Deflection and turning the conversation around to blame him and his leadership.

Miles thinks he portrays a lack of responsibility.

Some things Chris said during the meeting he didn't understand – specifically that he wasn't engaged. Chris pressed him on data, specifically about reducing the college and career coordinator position. Chris said he's being asked to do more with less. The last thing is Chris said this isn't working for him. Miles said he reflected on it and that it's not working for him either.

Doesn't seem like he's willing to make concessions as we go into this period of reduction.

Miles said thought once the deflection started, Miles didn't want him to escalate. Said then Chris wanted a response and wasn't' getting it and that he was engaged. He said he didn't know how to take all of that.

But ultimately, doesn't have an AS that isn't aligned to the organization. If it's happening with Miles, he suggests that it's happening others.

He's suggesting an amicable split with the organization that works the best for everyone. Consider this weekend what a separation might look like from a nonpublic situation. Jeff is open to negotiate the terms of the separation agreement. We can talk on Monday at the end of the day about what it can look like. Miles respects him and feels as though he's done his best to support him. Miles has tried to step in and take some responsibility. If he doesn't hear on Monday, he would have to consider his adjustments to the department.

Chris said he feels blindsided and that he doesn't feel supported. He wasn't prepared and asked for an agenda. That's not providing support to him. He will take the weekend and will reflect.

Miles is blocking out 3-4 on Monday to sit down and talk about what next steps look like.

The meeting ended at 12:03.

3

# EXHIBIT E

11/27/25 Letter to J. Litts



Casey Alan Coyle
Attorney at Law
T  267.939.5832
ccoyle@babstcalland.com

November 27, 2025

*Via Email*
Jeffrey D. Litts, Esquire
Solicitor
School District of Lancaster
c/o Saxton & Stump
280 Granite Run Drive, Suite #300
Lancaster, PA 17601
jlitts@saxtonstump.com

**Re:    Christoper Lopez—Immediate Action Required**

Dear Attorney Litts:

We represent Christopher Lopez.  As you know, Mr. Lopez currently serves as an Assistant Superintendent for the School District of Lancaster.  As you may also know, Mr. Lopez has worked for the District for 27 years and amassed a stellar performance record during that time.  Indeed, Mr. Lopez was the only member of the District's senior leadership team that received a "distinguished" performance rating last year.  Mr. Lopez is therefore one of the most dedicated and decorated public servants within the District.

Nonetheless, the District's Superintendent, Dr. Keith Miles, placed Mr. Lopez on indefinite administrative leave on November 14, 2025.  At that same meeting, Dr. Miles demanded that Mr. Lopez prepare a separation agreement by 3:00 p.m. on November 20, 2025.  Mr. Lopez did not prepare the requested agreement.  Dr. Miles subsequently scheduled a meeting with Mr. Lopez for 9:00 a.m. on December 1, 2025, and upon information and belief, Dr. Miles intends to terminate Mr. Lopez if Mr. Lopez does not resign at that meeting.

Mr. Lopez will not resign from his position as an Assistant Superintendent for the District, and should Dr. Miles terminate Mr. Lopez in response, it will fly in the face of Mr. Lopez's Employment Agreement.  This is because the Agreement clearly, specifically, and unambiguously states that Mr. Lopez can only be terminated for "valid and just cause for the reasons specified in Section 1080 of the Public School Code."  (8/20/24 Employment Agreement ¶ 7(d), attached hereto as "**Exhibit A**.")  Such cause is lacking here as the apparent genesis of Mr. Lopez's anticipated termination is a closed-door discussion between him and Dr. Miles on November 12, 2025, and nothing that Mr. Lopez uttered during that discussion comes remotely close to constituting "neglect of duty, incompetency, intemperance, or immorality."  24 P.S. § 10-1080(a).  Thus, any attempt by Dr. Miles to terminate Mr. Lopez will result in the School Board "arbitrarily" and "capriciously" terminating Mr. Lopez, in breach of his Employment Agreement.

Accordingly, we demand that Mr. Lopez be removed from administrative leave and returned to his position as Assistant Superintendent for the District, effective at 8:00 a.m. on December 1, 2025.

Jeffrey D. Litts, Esquire
November 27, 2025
Page 2

Failure to comply with this directive will result in litigation against Dr. Miles and the District. We therefore ask that you forward this letter to Dr. Miles and the School Board immediately.

Given the prospect of litigation among Mr. Lopez, the School District, and Dr. Miles, please instruct Dr. Miles, the members of the School Board, and other appropriate personnel within the District to preserve and not modify or destroy all communications and documents—including, but not limited to, text messages, emails, letters, handwritten notes, voicemails, communications on social media such as LinkedIn and Facebook, etc.—relating in any way, shape, or form to this dispute. This is an ongoing duty, and it extends to preserving both personal and work computers, laptops, tablets, cell phones, thumb drives, and other electronic devices.

Very Truly Yours,

Casey Alan Coyle

Enclosure

Cc:    Morgan M. Madden, Esquire (via email)

# EXHIBIT A
## Employment Agreement

## EMPLOYMENT AGREEMENT FOR ASSISTANT SUPERINTENDENT

THIS AGREEMENT is made and entered this 20th day of August 2024, by and between the Board of School Directors of the School District of Lancaster (hereinafter referred to as "School District") and Christopher N. Lopez (hereinafter referred to as "Assistant Superintendent").

WHEREAS, the Board of School Directors (hereinafter "Board") of the School District of Lancaster, at a regularly scheduled meeting duly and properly called on the 20th day of August 2024, did appoint Christopher N. Lopez, to the office of Assistant Superintendent for the School District in accordance with the provisions of Sections 508, 1071, 1073, and 1076 of the Public School Code of 1949, as amended, 24 P.S. §§ 5-508, 10-1071, 10-1073 and 10-1076 ; and

WHEREAS, the parties have agreed upon certain terms and conditions of employment and desire to reduce said terms and conditions to writing;

Intending to be legally bound and in consideration of the mutual covenants herein contained, the parties agree as follows:

1.     Employment. The School District employs the Assistant Superintendent, and the Assistant Superintendent accepts employment, under the terms and conditions of this Agreement.

2.     Terms of Employment. The term of employment of the Assistant Superintendent pursuant to this Agreement shall commence on August, 21, 2024 and shall continue until August 20, 2028 unless terminated sooner pursuant to the provisions of this Agreement. This Agreement shall terminate on August 30, 2028 unless the Agreement is renewed for an additional term pursuant to Section 1077 of the Public School Code of 1949, as amended, 24 P.S. § 10-1077.

3.     Professional Certification. As a condition precedent to this Agreement, the Assistant Superintendent shall hold and maintain a valid Letter of Eligibility issued by the Department of Education, Commonwealth of Pennsylvania. The Assistant Superintendent covenants that he possesses all the qualifications that are required by law to serve as the Assistant Superintendent at the beginning of his term of employment under this Agreement. If the Assistant Superintendent does not possess, hold or maintain the necessary credentials to serve as Assistant Superintendent throughout his employment term this Agreement shall be null and void.

4.     Duties and Nature of Service.

    a)     The Assistant Superintendent is employed as the Assistant Superintendent of the School District. In addition to those duties and powers conferred by law, the Assistant Superintendent shall (subject to the control and direction of the Board) perform such duties as assigned to him by the Board and/or by the Superintendent as set forth in Section 1082 of the Public School Code. 24 P.S. § 10-1082.

    b)     The Assistant Superintendent shall devote the Assistant Superintendent's full working time and best efforts to the performance of the Assistant Superintendent's duties as Assistant Superintendent for the School District. The Assistant Superintendent so long as

consistent with performance of the Assistant Superintendent's duties, may with the prior approval of the Superintendent (i) attend seminars, conferences and conventions related to the duties of the Assistant Superintendent's position or the activities of School District and (ii) undertake consultation work, speaking engagements, writing, lecturing, or other professional duties and obligations, with or without honorarium, provided that the Assistant Superintendent shall not accept any honorarium that has not been previously disclosed to the Superintendent prior to undertaking the consultation work, speaking engagement, writing, lecturing or other professional duties and obligations.

5.         Compensation.

a)         As compensation for the Assistant Superintendent's services and performance of his obligations under this Agreement, the School District shall pay to the Assistant Superintendent an annual salary at the rate of $185,000 per fiscal year, starting with 2024-2025 school year, payable on School District's customary salary payment dates. Such salary shall be evaluated annually and may be increased from time to time at the discretion of the Board. In addition, upon attaining mutually agreed upon objectives, the Assistant Superintendent shall be entitled to incentive pay in an amount determined at the discretion of the Board.

b)         In addition to the other compensation and benefits provided in this Agreement and except as otherwise provided herein, the Assistant Superintendent shall, in addition to the fringe benefits specifically included or referenced herein, be entitled to any fringe benefits (including post-retirement benefits) set forth in the School District's Act 93 Administrative Compensation Plan adopted pursuant to Section 1164 of the Public School Code of 1949, as amended 24 P. S. § 11-1164 ("Act 93 Plan") in effect on the commencement of this Agreement. If the fringe benefits under the School District's Act 93 Administrative Compensation Plan are increased, then the fringe benefits of the Assistant Superintendent shall be increased in the same manner.

c)         In addition to the fringe benefits described in subparagraph (b) above, the Assistant Superintendent shall be entitled to the following benefits:

(i)         Conferences and Conventions. The School District shall (A) so long as consistent with the performance of his duties and with the prior approval of the Superintendent, provide the Assistant Superintendent with a reasonable amount of release time for the Assistant Superintendent's attendance at national and state conferences and conventions and (B) reimburse the Assistant Superintendent for costs reasonably and necessarily incurred to attend and participate in such conferences and conventions.

(ii)        Indemnification. In accordance with, and subject to, the provisions of the Political Subdivision Tort Claims Act, the Board shall defend, hold harmless and indemnify the Assistant Superintendent from demands, claims, suits, actions and legal proceedings brought against the Assistant Superintendent as agent and/or employee of the Board and/or School District, so long as the Assistant Superintendent does not engage in willful misconduct as that term is construed

-2-

and understood under the Political Subdivision Tort Claims Act. This obligation shall survive the termination of this Agreement.

(iii)    Section 403(b) Plan. The Assistant Superintendent shall be entitled to participate in the 403(b) tax sheltered annuity plan sponsored by the School District, as amended from time to time, and shall be eligible for all benefits offered under such plan. The School District will match fifty (50) cents on each dollar invested by the Assistant Superintendent up to five percent (5%) of his annual salary each fiscal year.

(iv)    Life/Disability Insurance. During the term of this Agreement, the School District shall provide the Assistant Superintendent with a term life insurance policy in the amount of two and one-half (2.5) times the annual salary of the Assistant Superintendent, and with a short-term disability insurance policy in the amount of 66 and 2/3rds of his annual salary (covering two years after the exhaustion of other paid leave).

(v)    Continuing Education and Professional Development. The District shall pay the full cost for the Assistant Superintendent's continuing education and professional development activities, including but not limited to leadership coaching, provided that such activities are approved in advance by the District Superintendent.

(vi)    Taxable, Non-PSERS Benefits Stipend. The Assistant Superintendent shall receive each fiscal year the amount of $2,500, which shall be taxable as income but not eligible for PSERS credit, to be utilized at the discretion of the Assistant Superintendent toward the purchase of additional employment benefits, and the payment of which shall be allocated among and added to the Assistant Superintendent's regular salary payments.

6.    Formal Written Performance Evaluation.

a)    No later than March 1 of each fiscal year, the Assistant Superintendent shall provide a written self-assessment to, the School District's Superintendent, and the Board. On or before April 1 of each fiscal year, the Board, the School District's Superintendent, and the Assistant Superintendent shall meet in closed executive session for the purpose of evaluation of the performance of the Assistant Superintendent. The Superintendent, in conjunction with the Board shall complete a written evaluation by June 1 of each fiscal year and shall use a mutually agreed upon method as the basis for said evaluation. Any assessment system selected shall require the Superintendent and the Board to speak in one voice.

b)    In the event it is determined that the performance of the Assistant Superintendent is unsatisfactory in any respect, the evaluation shall describe in writing and, in reasonable detail, the specific instances of unsatisfactory performance. A copy of the written evaluation shall be delivered to the Assistant Superintendent on or before June 30 of each year during the term of this Agreement. The Assistant Superintendent shall have the right to make a

-3-

written response to the evaluation. The evaluations and the Assistant Superintendent's responses shall be totally confidential, private and in no manner become public knowledge or conversation. The parties shall have the mutual right to waive a formal performance evaluation in any year of the Agreement provided; however, that the Assistant Superintendent's performance shall be deemed satisfactory and the Assistant Superintendent shall not be subject to discipline, discharge or removal on the basis of neglect of duty or incompetency in any year in which there is no evaluation. The parties shall attempt in good faith to comply with the foregoing milestone dates, but the evaluation process shall continue and the performance evaluation shall be valid even if there is delay in meeting such dates. In the event of delay, the parties shall in good faith attempt to agree upon an extension of time for the evaluation process.

c)      In accordance with Section 1073.1 of the Public School Code of 1949, as amended, 24 P.S. § 1073.1, the Superintendent in conjunction with the Board and the Assistant Superintendent shall agree on objective performance standards for use in the performance evaluation of the Assistant Superintendent. The parties shall agree upon such objective performance standards within 90 days of the Assistant Superintendent's appointment and thereafter prior to July 1 of each year. The objective performance standards shall be in writing, approved and executed by both parties, and shall be made a part of this Agreement. As required by Section 1073.1(b. 1) of the Public School Code, the written objective performance standards and whether the Assistant Superintendent met the agreed-to objective performance standards shall be posted in the School District's publicly accessible Internet website.

7.      Termination of Agreement. This Agreement may be terminated upon any of the following events:

   a) Agreement. This Agreement may be terminated by the mutual agreement of The Assistant Superintendent and the Board. Any such agreement that provides for severance compensation shall be in writing and subject to provisions of Section 1073(e)(3) of the Public School Code, as amended, 24 P.S. § 10-1073(e)(3).

   b) Resignation/Retirement. This Agreement will be terminated upon the resignation or retirement of the Assistant Superintendent. The Assistant Superintendent shall provide at least ninety (90) days advance written notice of his resignation or retirement, unless such notification is waived by the Board.

   c) Disability of The Assistant Superintendent. In the event that the Assistant Superintendent is disabled and unable to perform his duties for a period of three (3) consecutive months, then the School District may, by notice to the Assistant Superintendent given prior to the date the Assistant Superintendent is able to resume performance of his duties, terminate this Agreement.

   d) Termination for Cause. The Assistant Superintendent's employment may be terminated for cause. The Assistant Superintendent shall be subject to discharge for a valid and just cause for the reasons specified in Section 1080 of the Public School Code, as amended, 24 P.S. § 10-1080. The Board shall

-4-

not arbitrarily or capriciously call for the Assistant Superintendent's dismissal. and the Assistant Superintendent shall, in any event, have the right to written charges, notice of hearing, fair and impartial hearing, all elements of due process, and the right to appeal to a court of competent jurisdiction. At any such hearing before the Board, the Assistant Superintendent shall have the right to be present and to be heard, to be represented by counsel, and to present evidence, through witnesses and testimony, relevant to the issue. A transcript of the record of proceedings before the Board shall be made available without charge to the Assistant Superintendent. The Assistant Superintendent shall have the right to be represented by counsel at his sole cost and  expense during any termination proceedings.

e) Death. This Agreement shall be terminated in the event of the death of the Assistant Superintendent.

8.    Renewal. The Assistant Superintendent will advise the Board in writing at least six (6) months prior to the end of this Agreement as to his wish concerning extension and continued employment after the term of this Agreement. Likewise, the Board will deliberate in executive session, and notify The Assistant Superintendent at least six (6) months prior to the end of this Agreement whether there appears to be a general consensus among its members to continue or discontinue the relationship – however, this shall not constitute "official action" of the Board, and shall not in any manner be binding upon the Board. Any continuation of this Agreement beyond the duration stated herein shall require formal School Board approval at a public meeting. If the Board fails to take official action on the Assistant Superintendent's employment status at least ninety (90) days prior to the expiration of his employment term, the Assistant Superintendent's employment shall be extended one time for a one-year period pursuant to the terms outlined in this Agreement.

9.    Sick Leave. The Assistant Superintendent shall be credited with twelve (12) days of sick leave on July 1st of each year of this Agreement. The Assistant Superintendent shall be credited with 99.50 sick leave days he had accumulated as of the date of this Agreement during his School District employment. If the Assistant Superintendent has more than 100 accumulated sick leave days at the time of his annual allotment of sick leave days, The Assistant Superintendent shall forego the receipt of the allotted sick leave days and, in lieu of the same, receive a non-elective contribution to his 403(b) tax-deferred account that equals his then-current per diem rate of pay for each unused day of sick leave above his accumulated 100 days. However, the amount paid by the School District for any year shall not exceed the contribution limits of § 415(c)(1) of the Internal Revenue Code. If the amount due under this paragraph for any year exceeds the applicable contribution limit for any year, the unpaid amount shall be contributed into the Assistant Superintendent's tax deferred account in the next year to the extent permitted under the applicable limitations, and shall continue in each succeeding year until the entire amount due has been contributed into the Assistant Superintendent' s tax deferred account. Upon separation or termination of employment, the Assistant Superintendent shall receive payment for all unused days of sick leave, up to a maximum of one hundred (100) days in accordance with Act 93 administrator compensation plan.

10.     Vacation Leave. The Assistant Superintendent shall be credited with twenty (20) days of vacation leave on July 1st of each year of this Agreement. The Assistant Superintendent shall be credited with the 37.50 vacation leave days he had accumulated as June 30, 2023 during his School District employment, subject to the limitations specified herein. The Assistant Superintendent may accumulate a maximum of forty (40) vacation days. As of June 30th of each year, the Assistant Superintendent may elect the option of being paid at his then-current per diem rate of pay for up to ten (10) unused vacation days each year of this Agreement. Any such election shall be submitted in writing to the Superintendent for processing. Upon separation or termination of employment, the Assistant Superintendent shall receive payment at this then-current per diem rate of pay for all unused days of vacation leave, up to a maximum of forty (40) days.

11.     Waiver of Breach. The waiver by School District of due performance of, or compliance with, any provisions of this Agreement by The Assistant Superintendent shall not operate or be construed as a waiver of due performance or compliance by The Assistant Superintendent thereafter.

12.     Severability. If any provision of this Agreement shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair, or invalidate the remainder of this Agreement.

13.     Headings. The headings in this Agreement are for convenience only and shall not be considered as part of this Agreement.

14.     Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

15.     Entire Agreement/Modification. This Agreement sets forth the entire understanding of School District and the Assistant Superintendent with respect to the subject matter of this Agreement. No waiver, change or modification of any of the terms of this Agreement shall be binding unless in writing and signed by both parties to this Agreement.

IN WITNESS WHEREOF, School District and The Assistant Superintendent have signed this Agreement.

SCHOOL DISTRICT OF LANCASTER

By: _____    Date: 8/20/24
    School Board President

By: _____    Date: 8-20-24
    Christopher N. Lopez

-6-

# EXHIBIT F

11/30/25 Email from J. Litts to C. Coyle

| | |
|---|---|
| **From:** | Jeffrey D. Litts <jlitts@saxtonstump.com> |
| **Sent:** | Sunday, November 30, 2025 12:06 PM |
| **To:** | Coyle, Casey A. |
| **Cc:** | Madden, Morgan M. |
| **Subject:** | RE: Christopher Lopez--Immediate Action Required |

> ATTENTION: Email sent from outside Babst Calland.

Mr. Coyle –

I'm acknowledging receipt of your letter and responding to the same via email to ensure a more prompt response.

I'm familiar with Chris Lopez's contact terms; unfortunately, your letter does not address the underlying reason why he was placed on paid administrative leave.

Chris yelled at his direct supervisor (Dr. Keith Miles) when told during a meeting that personnel changes would be occurring within his department.  As this meeting unfolded, Chris made a statement to Dr. Miles that he no longer wanted to work for the school district.  In light of those circumstances, Dr. Miles provided Chris with some time off to be able to confer with appropriate people and come up with proposed terms for an agreement to make his stated desire a reality.

The school district's superintendent does not need to allow a subordinate administrator to direct unprovoked anger at him or to undermine the good working relationships within the district's central office administrative team.  If Chris does not want to resign, he needs to talk directly with Dr. Miles regarding his changed position.  Moreover, Chris needs to be prepared for potential disciplinary consequences for his unprofessional behavior.  I do not know what those potential consequences might be, but Chris' procedural due process rights will be respected, if such action proves necessary.

Based upon your letter, I will assume Chris will attend the Monday meeting scheduled at 10 a.m. with him, Dr. Miles and the HR Director.  Attorneys can become involved later if that proves to be necessary.

Best wishes for the remainder of your holiday weekend,

Jeff Litts

**Jeffrey D. Litts** | Shareholder

**SAXTON & STUMP**
LAWYERS AND CONSULTANTS
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: 717.556.1092 | Internal: 1092
Fax: 717-441-3810
JLitts@saxtonstump.com
www.saxtonstump.com

  

1

# **EXHIBIT G**

11/30/25 Email from M. Madden to J. Litts

**From:** Madden, Morgan M.
**Sent:** Sunday, November 30, 2025 7:45 PM
**To:** Jeffrey D. Litts
**Cc:** Coyle, Casey A.
**Subject:** RE: Christopher Lopez--Immediate Action Required

Good evening, Attorney Litts –

We appreciate your response.

We disagree entirely with the version of events as described in your email, which we presume is that of Dr. Miles given that he and Mr. Lopez were the only individuals present for the conversation in question.  To the contrary, Mr. Lopez at no time "yelled" at Dr. Miles, nor stated that he intended to tender his resignation – or suggest that he otherwise wanted to terminate his employment with the District.

Indeed, it is only now, two weeks after the initial conversation and having already had one meeting with Dr. Miles and Mr. Monskie that the notion of some intention to resign has been brought to light.  To be clear, Mr. Lopez has every intention of continuing in his role as Assistant Superintendent and will report to work tomorrow as regularly scheduled.

Given that position, it is unclear what the purpose of the meeting scheduled for tomorrow morning may be, but it is of concern that Mr. Lopez may be walking into a disciplinary discussion under the guise of a meeting to discuss his alleged intent to resign.  If the purpose of the meeting is truly for Mr. Lopez to convey his intentions, we would respectfully request that this email serve as formal notice of his intentions, obviating the need for the meeting altogether.  If, on the other hand, the stated purpose of the meeting is a ruse, and Dr. Miles intends to impose some sort of discipline nearly three weeks after the discussion took place (and after Dr. Miles claims that Mr. Lopez put himself on indefinite leave), then we ask that the meeting be held via Zoom or Teams and recorded, so that a complete and accurate record of their conversation can be made. And, should any discipline be given to Mr. Lopez in connection with the November 12th discussion – either tomorrow or at some future time –  he will insist the District afford him the due process that has been lacking to date, including but not limited to a full hearing before the Board.

 Thank you.


Note: We have moved our offices, and our new address is 300 N. 2nd Street, Suite 801, Harrisburg, PA 17101

**Morgan M. Madden**
Attorney at Law
mmadden@babstcalland.com

1



300 N. 2nd. Street
Suite 801
Harrisburg, PA 17101
**O** 717-868-8381
**C** 570-637-2679
www.babstcalland.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Babst, Calland, Clements and Zomnir, P.C.

2

# EXHIBIT H

12/1/25 Email from J. Litts to M. Madden

| | |
|---|---|
| **From:** | Jeffrey D. Litts <jlitts@saxtonstump.com> |
| **Sent:** | Monday, December 1, 2025 7:49 AM |
| **To:** | Madden, Morgan M. |
| **Cc:** | Coyle, Casey A. |
| **Subject:** | RE: Christopher Lopez--Immediate Action Required |

> ATTENTION: Email sent from outside Babst Calland.

Ms. Morgan,

You are correct we have a very different understanding of the underlying facts.

If Mr. Lopez believes his employment with the school district should continue, he understand that he has a duty to meet with his immediate supervisor, if asked to do so.  Thus, his attendance at this morning's meeting is not optional.

As I stated previously, Mr. Lopez will be afforded procedural due process if, or when, any potential disciplinary action is taken.  Until at that arises, however, Mr. Lopez does not get to ignore directives given to him by his employer.

Finally, this morning's meeting will not be recorded.  If you have any legal authority to support of your demand, kindly pass it along and we can review it.

Jeff Litts

**Jeffrey D. Litts** | Shareholder

**SAXTON & STUMP**
LAWYERS AND CONSULTANTS
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: 717.556.1092 | Internal: 1092
Fax: 717-441-3810
JLitts@saxtonstump.com
www.saxtonstump.com

  

1

# <u>EXHIBIT I</u>

Monskie Notes of 12.1.25 Meeting



---------- Original Message ----------
From: "Lopez, Christopher" <clopez@sdlancaster.org>
To: CHRIS LOPEZ <cnlopez@comcast.net>
Date: 12/01/2025 4:41 PM EST
Subject: FW: FU Meeting w/ Lopez

**From:** Monskie, Gregory E. <gemonskie@sdlancaster.org>
**Sent:** Monday, December 1, 2025 4:10 PM
**To:** Lopez, Christopher <clopez@sdlancaster.org>
**Subject:** FW: FU Meeting w/ Lopez

As requested.

**From:** Monskie, Gregory E. <gemonskie@sdlancaster.org>
**Sent:** Monday, December 1, 2025 10:41 AM
**To:** Monskie, Gregory E. <gemonskie@sdlancaster.org>
**Subject:** FU Meeting w/ Lopez

Miles wished him to have had a good holiday. Asked him to consider what the options are and knows counsel has spoken. Asked him to give his response/options.

Chris stated his plan is to be reinstated and continue working for the school district.

1

Miles asked if there is any elaboration regarding the not working for him comment. He shared concerns with data driven decision making and the impact that it has on his department. At no point did he intend to resign at all and that was never discussed. That conversation, according to Chris, was about data driven decision making.

Chris said that the first step in the process is to request reinstatement and to be taken off leave.

Miles said that our next step is continue on leave and explore our options in light of that.

That was all we had and Chris left at 10:03.

## CERTIFICATE OF SERVICE

I, Casey Alan Coyle, certify that on this 23rd day of April, 2026, I electronically filed the foregoing AMENDED COMPLAINT using the Court's CM/ECF System, that all participants in this are registered CM/ECF users, and that service will be accomplished by the CM/ECF service.

/s/ Casey Alan Coyle
Casey Alan Coyle